IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CRYSTAL SANDERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 3:09-CV-0307-P |
| | § | |
| DALCRAFT, LLC, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Now before the Court is Defendant's Motion for Summary Judgment, filed by Dalcraft, LLC ("Dalcraft") on December 21, 2009. A Response was filed by Plaintiff Crystal Sanders ("Sanders"), on January 20, 2010, and a Reply was filed on February 4, 2010. For the reasons set forth below, the Court concludes that Defendant's Motion for Summary Judgment should be GRANTED as to all of Plaintiff's claims.

**I.     BACKGROUND**

This is an employment discrimination lawsuit under Chapter 21, TEX. LABOR CODE, with pendent Texas common law claims. Sanders was employed by Dalcraft as a cocktail waitress at the W Hotel from September 27, 2007 until June 9, 2008. Sanders claims that, shortly after her employment began, her immediate supervisor Tom Landry ("Landry") began sexually harassing her by kissing, grabbing and groping her.[1] (Pl.'s Resp. (p. 4).) During Sanders' employment at Dalcraft,

---

[1] For the purpose of analyzing Defendant's Motion for Summary Judgment, Sanders' allegations against Landry are accepted as true.

Landry repeatedly kissed her on the cheeks, grabbed her hands and waist, groped her lower back/upper buttocks and pulled her towards him in a sexual manner. (*Id*. at 5.) Additionally, on one occasion, Landry grabbed Sanders, and while restraining her he asked for a kiss. (*Id*. at 8.) Sanders tried to appease Landry by kissing him on the cheek, but Landry became livid saying "I want a real kiss." *Id*. Landry then kissed Sanders on her lips before releasing her. *Id*.

On November 26, 2007, Landry asked Sanders and other employees to accompany him to a W Hotel room, on the pretext that the visit was job related. (*Id*. at 5.) During the visit, Landry asked Sanders to stay behind after the other employees left, claiming that he needed to talk to her. *Id*. After the other employees left, Landry invited Sanders to spend the night with him in the hotel room. (*Id*. at 6.) When Sanders refused, Landry became angry and threatened Sanders by telling her "Well you should know that if anyone finds out you were in a W Hotel room, you'll be fired." *Id*. During her employment with Dalcraft, Sanders was repeatedly asked by Landry to accompany him to W Hotel rooms for sexual purposes. (*Id*. at 7.)

During her employment at Dalcraft, Sanders was also subjected to unwelcome sexual comments by Landry. On one occasion, Landry said "you've got the sexiest legs I've ever seen." (*Id*. at 8.) On another occasion Landry said "Crystal, you've got the best ass in this place. I'd like to see that!" *Id*. Landry's harassment of Sanders was ongoing as Landry repeatedly asked Sanders on dates and asked her to go to strip clubs with him. *Id*.

After an employee meeting in April 2008, Sanders approached Stacey Bowers ("Bowers") and told her that she needed to speak with her about Landry. (*Id*. at 12.) The two women met the following day, and Sanders informed Bowers of Landry's harassing behavior. *Id*. After Sanders

reported this behavior to Bowers, Landry's sexual harassment of Sanders stopped. (Def.'s Ex. 2 Deposition of Crystal Sanders (p. 34-35, 41).)

However, Sanders claims that immediately after reporting Landry's behavior, she began experiencing retaliatory actions including Landry yelling at her, being given fewer hours to work, being assigned to patio shifts, and the implementation of a tip-pooling policy. (Pl.'s Resp. (p. 13-15).) Accordingly, Sanders complained again to Bowers, and then complained to the Dalcraft corporate office. (*Id*. at 16-18). An investigation into Landry's actions was initiated, and Landry resigned from Dalcraft. (*Id*. at 18.)

Shortly after making this second complaint, Sanders was terminated for adding gratuities to two checks without managerial approval. *Id*. That same day, Sanders found a new job at Nick and Sam's. (*Id*. at 19.) However, at the conclusion of her two-week training program, Sanders was fired from Nick and Sam's. *Id*. Sanders alleges that Bowers conspired to have her fired from her new position at Nick and Sam's, (*Id*. at 20), and thus in addition to her claims of harassment and retaliation, Sanders has claimed that Dalcraft has defamed her and tortiously interfered with her employment at Nick and Sam's. (Pl.'s Pet. (p. 6-7).)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must identify the evidence on file in the case which establishes the absence of any genuine issue of material fact. *See Celotex,* 477 U.S. at 323.

Once the moving party has made an initial showing, the opposing party must offer evidence sufficient to show the existence of the required elements of the party's case. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment; the party defending against a motion for summary judgment cannot defeat the motion unless it provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in its favor. *See Anderson*, 477 U.S. at 256-57. Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgement are likewise insufficient to defeat a motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

All evidence and the inferences to be drawn therefrom "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment must be granted. *See Celotex*, 477 U.S. at 322-23. Finally, in reviewing the summary judgment evidence, the Court has no duty to search the record for triable issues; rather, it need rely only on those portions of the submitted documents to which the nonmoving party directs its attention. *See Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

### III.     Sander's Sexual Harassment Claim

#### A.     Legal Standard under Title VII

Because one of the stated purposes of the Texas Commission on Human Rights Act (the "TCHRA") is "to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964" and its amendments, we look to federal precedent for guidance when interpreting the Act. TEX. LAB. CODE ANN. § 21.001(1) (Vernon 1996); *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). Title VII provides a cause of action for individuals subjected to a sexually hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).

A plaintiff complaining of sexual harassment by a workplace supervisor must establish four elements to set forth her claim: (1) that she belongs to a protected class, female; (2) that she was the subject of unwelcome sexual harassment; (3) that the harassment was based upon sex; and (4) that the harassment affected a "term, condition or privilege" of employment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Once the employee makes this showing, an "employer is subject to vicarious liability to a victimized employee." *Faragher*, 524 U.S. at 807.

However, the defendant may raise an affirmative defense to liability so long as the employer can establish that the harassment did not culminate in a "tangible employment action" against the employee. *Id*. The affirmative defense consists of two prongs: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. If, however, the

supervisor's harassment culminated in a tangible employment action, then the employer is not entitled to raise the affirmative defense. *Id.*

The Fifth Circuit also provided guidance in the application of the *Ellerth/Faragher* test. *See Casiano v. AT&T Corp.*, 213 F.3d. 278 (5th Cir. 2000). In accordance with the "Supervisor Sexual Harassment Roadmap" attached as an Appendix to *Casiano*, the Court must first ask whether the complaining employee suffered a "tangible employment action." *Id.* at 283. If the answer is "yes," the Court classifies the suit as "quid pro quo" and then analyzes whether the tangible employment action resulted from the employee's acceptance or rejection of the supervisor's alleged sexual harassment. *Id.*

Without a tangible employment action, the suit is a "hostile environment" case, which, to be actionable, requires the supervisor's actions to be severe and pervasive. *Id.* This requirement ensures that Title VII does not become a general civility code by "filter[ing] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *See Faragher*, 524 U.S. at 788 (internal citations omitted). After the court determines that the claim is actionable, the employer may raise the *Ellerth/Faragher* affirmative defense. *See Casiano*, at 213 F.3d at 284; *Ellerth*, 524 U.S. at 765.

### B. Quid Pro Quo Harassment Claim

As outlined in *Casiano*, the Court first asks whether Sanders suffered a tangible employment action. *Casiano*, 213 F.3d at 284 ("At the first stop on the *Ellerth/Faragher* road map, courts are required to determine whether the complaining employee has or has not suffered a "tangible employment action." If he has, his suit is classified as a "quid pro quo" case; if he has not, his suit

is classified as a "hostile environment" case."). Tangible employment actions consist of "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

In this case, Sanders presents no evidence of a tangible employment action. While Sanders does allege that she was assigned different duties (patio shifts) and was forced into tip pooling, she states in her original petition that these actions were retaliatory in nature. (Pl.'s Pet (p. 3).) Accordingly, this Court does not consider these actions to be evidence of tangible employment actions in relation to her sexual harassment claim.

Under an alternative theory, Plaintiff seeks to assert that quid pro quo sexual harassment is evidenced by the fact that Dalcraft conditioned Sanders' continued employment on her submission to sexual harassment. (Pl.'s Resp. Br. (p. 7-9).) Under this approach, Plaintiff argues that while the threatened tangible employment action (termination) never occurred, it was only because she submitted to Landry's harassment. Plaintiff cites two cases that support the idea that a supervisor's linking of tangible job benefits to the acceptance or rejection of sexual advances is quid pro quo harassment even when the employee's submission to the advances helped the employee to maintain the benefits. (Pl.'s Resp. Br. (p. 7-8).) (citing *Karibian v. Columbia University*, 14 F.3d 773, 778 (2nd Cir. 1994) and *Showalter v. Allison Reed Group, Inc.*, 767 F.Supp.1205, 1212 (D.R.I., 1991)).

However, this Court finds Plaintiff's argument unconvincing for two reasons. First, the Supreme Court has maintained that the quintessential difference between quid pro quo harassment and a hostile environment is whether the threatened tangible employment action has occurred. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998) ("We do not suggest the terms *quid pro*

*quo* and hostile work environment are irrelevant to Title VII litigation. *To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general*, *the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII.*") (emphasis added).

Second, and more importantly, Plaintiff has submitted no evidence that Landry ever conditioned her continued employment on her acceptance of his sexual advances. Sanders has repeatedly pointed to the night that Landry propositioned her in the W Hotel room as an example of quid pro quo harassment. (Pl.'s Resp. Br. (p. 8).) However, even accepting Plaintiff's allegations as true, Landry never conditioned Sanders' continued employment on the fact that she spend the night with him. It was only after Sanders rejected Landry's advances, that Landry stated she could be fired if she told anyone she had been in a W Hotel room. *Id*. Additionally, as Plaintiff contends that she continued to reject Landry's repeated attempts to get her into a W Hotel room, she has made it clear that she was not submitting to Landry's sexual advances in order to maintain her employment. (*Id*. at 11.)

### C. Hostile Environment Claim

Because Sanders cannot establish a case of quid pro quo harassment, her claim is viewed as a "hostile environment" case. *Casiano*, 213 F.3d at 284. Accordingly, the next inquiry the Court must make is whether the actions ascribed to the Landry by the Sanders constitute severe or pervasive sexual harassment. *Id*.

As noted earlier, a plaintiff complaining of sexual harassment by a workplace supervisor must establish four elements to set forth her claim of a hostile work environment. In this case, only

the fourth element–whether the harassment affected a term, condition, or privilege of employment–is at issue. (Def.'s Br. (p. 14)); (Pl.'s Resp. Br. (p. 7)).) For harassment to affect a "term, condition or privilege" of employment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). Whether workplace harassment is abusive is determined by looking at all the circumstances, including frequency, severity, and whether it reasonably interferes with an employee's performance. *Harris*, 510 U.S. at 21-23.

Sanders alleges that Landry sexually harassed her in the following ways: 1) by rubbing Sanders' lower back and by grabbing and holding Sanders' hands and pulling her towards him; 2) by subjecting her to unwanted kisses on the cheek; 3) by kissing her on the lips once; 4) by staring at her legs and saying "You've got the sexiest legs I've ever seen"; 5) by saying "You've got the best ass in this place. I'd like to see that!"; and 6) by propositioning her in the W Hotel room. (Pl.'s App. 131-133).

In *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004), the Fifth Circuit held that similar actions did not amount to discriminatory changes in the "terms and conditions of employment.[2] This case, however, is distinguishable from *Hockman* in that Sanders

---

[2]"Here, Hockman claims that in the approximate year and a half that she worked for Westward, Rogers harassed her in the following ways: (1) he *once* made a remark to Hockman about another employee's body, (2) he *once* slapped her on the behind with a newspaper, (3) he "grabbed or brushed" against Hockman's breasts and behind, (4) he *once* held her cheeks and tried to kiss her, (5) he asked Hockman to come to the office early so that they could be alone, and (6) he *once* stood

alleges that Landry's offensive activities were not "isolated incidents." Sanders alleges that Landry 1) repeatedly asked her out on dates; 2) repeatedly asked her to go to strip clubs; 3) repeatedly kissed her on her cheeks and attempted to kiss her lips; and 4) would always try to get her to go up to W Hotel rooms. (Pl.'s App. (p. 5, 23).) Accepting these allegations as true, this Court finds that Landry's repeated actions were, as a matter of law, so pervasive as to create an abusive environment.

### D. Affirmative Defense

Despite finding that Landry's alleged activity was severe or pervasive enough to constitute a Title VII violation, Dalcraft will still be entitled to establish the *Ellerth/Faragher* affirmative defense if it can show that (1) it exercised reasonable care to prevent and correct promptly any such sexual harassment, and (2) Sanders unreasonably failed to take advantage of any preventative or corrective opportunities provided by Dalcraft. *Casiano*, 213 F.3d at 284.

"[T]he Supreme Court has observed that an employer's argument that it exercised reasonable care may be substantially stronger where the employer: (1) has an anti-harassment policy specifically addressing the particular harassment, (2) the policy provides for alternative means of reporting harassment, and (3) the policy has been communicated to the employees." *Burrell v. Crown Cent. Petroleum, Inc.*, 121 F.Supp.2d 1076, 1082 (E.D.Tex. 2000).

---

in the door of the bathroom while she was washing her hands . . . Rogers's remarks to Hockman about Ledesma's body and requests to be alone with Hockman are offhand comments that are boorish and offensive, but not severe. Similarly, the newspaper slap amounts to "simple teasing," which "will not amount to discriminatory changes in the 'terms and conditions of employment.' The attempted kiss and bathroom incident were *isolated incidents* that were not serious." *Hockman*, 407 F.3d at 328 (citations omitted) (emphasis added).

As to the first two elements, Dalcraft has demonstrated that it had an anti-harassment policy that specifically addressed sexual harassment, and that provided for alternative means of reporting the harassment. (Def.'s Ex. 12 and 13). As to the third element, this anti-harassment policy was included in the employee handbook that was distributed to new employees including Sanders.[3] Additionally, on March 7, 2008, Sanders and other employees received a revised version of the employee handbook (which again contained the anti-harassment policy), and agreed "to fully and completely read the Employee Handbook and to abide by the policies, rules and regulations contained therein." (Def.'s Ex.16).[4]

Despite having knowledge of Dalcraft's anti-harassment policy, Sanders failed to complain about the alleged continuous harassment for several months. While Sanders puts forth several reasons including confusion as to Dalcraft's hierarchy for her delay, (Pl.'s Resp. Br. (p. 20)), this Court ultimately finds those reasons unconvincing, and has determined that Sanders unreasonably failed to take advantage of any preventative or corrective opportunities provided by Dalcraft.

---

[3] In her deposition, Sanders admitted receiving the handbook when hired. (Def.'s Ex.2, p.22 (Depo. p. 97).)

[4] In her Response, Plaintiff argues that she never received the revised handbook, but in her deposition, Sanders repeatedly states "I don't remember if I received a handbook." (Def.'s Ex.2, p.22 (Depo. p. 97-100).) This Court has previously held that this type of testimony does not create an issue of fact. *Jones v. Fujitsu Network Communications, Inc.*, 81 F.Supp.2d 688, 692 (N.D.Tex 1999) (holding that it was uncontroverted that an employee had attended a training class when the employee's signature was on the sign-in sheet for the class, and the employee stated in his affidavit that he did not remember attending any such meeting). *See also Petrunti v. Cablevision*, No. 08-CV-2277(JFB)(AKT), 2009 WL 5214495, at *11 (E.D.N.Y. Dec. 30, 2009) ("Plaintiff's lack of recollection is insufficient, however, to create a triable issue of fact."); *Costello v. St. Francis Hosp.*, 258 F.Supp.2d 144, 148 (E.D.N.Y. 2003) (finding that no issue of fact created in ADA case simply because plaintiff repeatedly answered deposition questions by stating "I don't recall" or "I don't remember").

*Casiano*, 213 F.3d at 287 (finding employee unreasonably failed to take advantage of any preventive or corrective opportunities when he failed to report numerous propositions that occurred over a four month period).

Sanders also argues that when she did report Landry's behavior, Dalcraft "failed to exercise reasonable care to correct Landry's sexual harassment." However, it is undisputed that once Sanders complained to her General Manager, Stacy Bowers ("Bowers") about Landry, the sexual harassment stopped. (Def.'s Br. (p.22)) (quoting Sanders' deposition testimony). Additionally, in the month following Sanders' initial complaint to Bowers, an investigation was initiated and Landry was placed on suspension and ultimately resigned. (Def.'s Br. (p. 23).) This Court finds that these actions, coupled with the fact that the harassment immediately stopped following Sanders' initial complaint, demonstrate that Dalcraft promptly corrected the harassment. Accordingly, Dalcraft is entitled to the *Ellerth/Faragher* affirmative defense

### IV. Sander's Retaliation Claim.

To establish a prima facia case of retaliation, Sanders must show that 1) she engaged in a protected activity, 2) Dalcraft took action that a reasonable employee would find materially adverse; and 3) that a causal connection exists between the protected activity and the adverse action. *Burlington Northern & Santa Fe Ry., Inc. v. White*, 548 U.S. 53, 68 (2006). After making a prima facie case, the burden shifts to Dalcraft to articulate a non-discriminatory reason for the employment decision; at that point, the burden returns to Sanders to show that Dalcraft's explanation is mere pretext for unlawful retaliation. *McDonnell-Douglas. Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973).

The Court finds that Sanders cannot establish a prima facia case of retaliation for the alleged the pre-termination retaliation.[5] Even accepting Plaintiff's allegations as true, the tip-pooling and patio shift assignments were facially non-discriminatory. (Def.'s Br. (p. 32-33)) (quoting Plaintiff's deposition testimony that both policies were applied across-the-board to all waitresses). *See Fierros v. Texas Dep't of Health*, 247 Fed.Appx. 478, 479 (5th Cir. 2007) (holding that a policy that resulted in identical treatment of all similarly-situated employees was a legitimate and non-retaliatory). Additionally, while Sanders alleges that her hours were reduced by an average of 10 hours per week after complaining about Landry's harassment, her pay records indicate that this reduction did not occur. Accordingly, her assertions of a factual dispute are not sufficient to rebut the probative evidence provided by Defendant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). Finally, this Court finds that Landry's rudeness did not objectively rise to the level of a materially adverse action.

However, the Court finds that Sanders has established a prima facie case for retaliation under Title VII with respect to her termination. In April 2008, Sanders engaged in protected activity when she complained to Stacy Bowers ("Bowers") about Landry's activity. In the middle of May 2008, Sanders again complained, this time by calling the W Hotel's corporate office (who forwarded Sanders' complaints to Dalcraft). (Pl.'s Resp. (p. 17).) On June 9, 2008, Sanders was fired. As this adverse employment decision occurred less than one month after Sanders engaged in protected activity, and as Defendant does not challenge this point, this Court finds that a causal nexus exists

---

[5]Sanders alleges that the following activities were retaliatory in nature: 1) the implementation of tip-pooling; 2) the implementation of patio shifts; 3) the reduction of her work hours; and 4) yelling and rudeness directed at Sanders by Landry. (Pl.'s App. (p. 134-35).)

between the protected activity and Sanders' termination.

Dalcraft, however, has articulated a non-retaliatory reason for its decision to fire Sanders. On June 4, 2008, Sanders added gratuities to two customer tabs without managerial approval. (Def.'s Br. (p. 38)) (citing Plaintiff's admissions during her deposition that this was done without managerial approval). This is an activity that Dalcraft reserves for managers, and a manager must use their personal four digit code to add a gratuity to a party's tab.[6] Accordingly, when Sanders used such a code to add the gratuity, she violated Dalcraft policies, and was fired.

This non-retaliatory reason for Sander's termination shifts the burden back to Sanders, whose attempts to classify this reason as pretext are unconvincing. Accordingly, Sanders' retaliation claim fails as a matter of law.

## V.     Common Law Claims

In addition to the claims stemming from her employment and termination from Dalcraft, Sanders further alleges common law claims of defamation and tortious interference. (Pl.'s Pet. (p. 6-7).) Sanders alleges that another Dalcraft employee, Kari Byers ("Byers"), told her that she overheard Bowers telling another Dalcraft employee Maria Booth ("Booth") to contact Nick and Sam's and tell them that Sanders was fired for stealing. However, as Defendant properly argues, Sanders' own testimony on this matter is inadmissible hearsay.

---

[6]Sanders argues that if a manager had been available "he would have undoubtedly approved [the] gratuity," and to support this position she cites the deposition testimony of J.R. Reyna ("Reyna"). (Pl.'s Resp. Br. (p. 28).) However, while Reyna states that it may have been rare to not add such a gratuity, his testimony reflects that the decision to add a gratuity to a tab is hardly "automatic" as it is the result of a deliberative process that involves both the manager and the cocktail waitress. (Pl.'s App. (p. 82).)

In contrast, Defendant has provided the Court with admissible summary judgment evidence which establishes that no one from Dalcraft played any role in Sanders' termination from Nick & Sams's. First, Bowers has denied having any conversations with anyone from Nick & Sam's or directing Booth to do so . (Def.'s Ex. 2 (p. 25).) Additionally, Defendant has provided the Court with a sworn statement in which Byers denies that she never heard Bowers give any such instruction to Booth, or that she ever told Sanders that she had overheard such a conversation. (Def.'s Ex. 37). Additionally, Dalcraft has provided sworn statements from Charles T. Martin and Harry Cox (the general manager and the server trainer at Nick and Sam's who were involved in the hiring, training and termination of Sanders), stating that neither of them had any communications regarding Sanders with anyone affiliated with Dalcraft. (Def.'s Ex. 29 & 30).[7] As Dalcraft has provided sworn statements and deposition testimony that are uncontroverted, Sanders' defamation and tortious interference claims fail as a matter of law.

---

[7]Plaintiff argues that these last two affidavits should be excluded as the Defendant failed to disclose Martin and Cox as individuals with knowledge of relevant facts in its initial disclosures. (Pl.'s Resp. Br. (p. 33-34).) However, Dalcraft responds that Plaintiff should have been on notice that these managers were witnesses as Sanders had claimed that Martin and Cox had fired her in response to being told something by a Dalcraft employee. (Def.'s Rep. (p. 5-8).) As this omission is essentially harmless, and as Dalcraft has cured any prejudice by paying for the deposition of these two witnesses, this Court rejects Plaintiff's argument that the affidavits be stricken. (*Id*. at 9).

## VI. CONCLUSION

Upon careful review of the parties' arguments, the summary judgment record, and the relevant law, the Court concludes that Plaintiff has failed to demonstrate a material dispute of fact as to her TCHRA claims. Additionally, Plaintiff has provided no admissible evidence that would support her common law claims. Accordingly, Dalcraft's motion for summary judgment is hereby GRANTED as to each of Plaintiff's claims.

**SO ORDERED.**

Signed this 1st day of March 2010.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE